UNITED STATES DISTRICT COURT
DISTRICT OF NEW JERSEY

| | |
|---|---|
| JOAN CRESCENZ,<br>    Plaintiff,<br><br>    v.<br><br>PENGUIN GROUP (USA) INC. and<br>MICHAEL CAPUZZO,<br>    Defendants. | CIVIL NO. 11-0493(NLH)(AMD)<br><br>OPINION |

**Appearances:**

DANIELLE MYRIAH WEISS
CLIFFORD E. HAINES
HAINES & ASSOCIATES
1835 MARKET STREET
SUITE 2420
PHILADELPHIA, PA 19103

   On behalf of plaintiff

HOWARD J. SCHWARTZ
NANCY ANN DEL PIZZO
LINDSAY A. SMITH
WOLFF & SAMSON, PC
ONE BOLAND DRIVE
WEST ORANGE, NJ 07052

   On behalf of defendants

**HILLMAN**, District Judge

   This action concerns plaintiff's claims of defamation and false light. Presently before the Court is defendants' motion for summary judgment. Also pending is plaintiff's motion for partial summary judgment on the burden of proof. For the reasons expressed below, defendants' motion will be granted, and plaintiff's motion will be denied as moot.

## BACKGROUND

Defendant, Michael Capuzzo, wrote a non-fiction book, *The Murder Room: The Heirs of Sherlock Holmes Gather to Solve the World's Most Perplexing Cold Cases* published by defendant Penguin Group (USA), Inc. in August 2010.  The book concerns the history of the Vidocq Society, an association of forensic professional and private citizens from across the United States who gather together in Philadelphia, Pennsylvania to solve cold crimes using their collective investigative talents and resources.  One founding member of the Vidocq Society featured in the book is Frank Bender, a renowned forensic artist internationally acclaimed for creating sculptures of the faces of crime victims based on molds he created from their decayed skulls.  Bender was also renowned for creating age progression sculptures of the faces of some of the world's most wanted fugitives.  Crimes have been solved based upon Bender's work.

Plaintiff, Joan Crescenz, met Bender in 1975, and for almost 30 years worked as his artist's assistant, bookkeeper, and personal assistant.  When Bender became terminally ill, Crescenz assisted him with his healthcare needs until his death on July 28, 2011.  Bender had been married to Jan Bender for almost 30 years until her death in 2010.  They had an "open marriage," and Bender was known for his "overt sexuality" and "self-professed sexual exploits."  (Compl. ¶¶ 17, 18.)  Crescenz has been married to

Peter Crescenz for more than 20 years and has three children.

In her complaint, Crescenz claims that defendants defamed her in the book by Capuzzo's references to Crescenz as one of Bender's girlfriends with whom he had a sexual relationship. Crescenz claims that she never had a sexual relationship with Bender, and that Capuzzo never asked her if she and Bender had a sexual relationship. Crescenz also claims that Capuzzo never provided her with an advance copy of the book so that she could verify the truth of Capuzzo's twelve references to her in the book; if he had, Crescenz claims that she would have corrected the false statements about her. Crescenz claims that Capuzzo, as well as the publisher, Penguin, were negligent and reckless in publishing the false statements about her, particularly after she emailed the book's publisher, William Shinker, on July 28, 2010, before the book's release in August 2010, informing him of the inaccuracies she discovered when Bender provided her with a galley copy.

Capuzzo and Penguin have moved for summary judgment in their favor on Crescenz's claims of defamation and false light invasion of privacy. Crescenz has opposed their motion, arguing that a jury must decide her claims. Crescenz has also filed a motion for partial summary judgment asking the Court to decide what standard of proof is required for each of her claims.

**DISCUSSION**

**A.   Jurisdiction**

This Court has jurisdiction over this matter pursuant to 28 U.S.C. § 1332 because there is complete diversity of citizenship between the parties and the amount in controversy exceeds $75,000.

**B.   Summary Judgment Standard**

Summary judgment is appropriate where the Court is satisfied that the materials in the record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations, admissions, or interrogatory answers, demonstrate that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law.  Celotex Corp. v. Catrett, 477 U.S. 317, 330 (1986); Fed. R. Civ. P. 56(a).

An issue is "genuine" if it is supported by evidence such that a reasonable jury could return a verdict in the nonmoving party's favor.  Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986).  A fact is "material" if, under the governing substantive law, a dispute about the fact might affect the outcome of the suit.  Id.  In considering a motion for summary judgment, a district court may not make credibility determinations or engage in any weighing of the evidence; instead, the non-moving party's evidence "is to be believed and all justifiable inferences are to be drawn in his favor."  Marino v. Industrial Crating Co., 358

F.3d 241, 247 (3d Cir. 2004)(quoting Anderson, 477 U.S. at 255).

Initially, the moving party has the burden of demonstrating the absence of a genuine issue of material fact. Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986). Once the moving party has met this burden, the nonmoving party must identify, by affidavits or otherwise, specific facts showing that there is a genuine issue for trial. Id. Thus, to withstand a properly supported motion for summary judgment, the nonmoving party must identify specific facts and affirmative evidence that contradict those offered by the moving party. Anderson, 477 U.S. at 256-57. A party opposing summary judgment must do more than just rest upon mere allegations, general denials, or vague statements. Saldana v. Kmart Corp., 260 F.3d 228, 232 (3d Cir. 2001).

**C.   Analysis**

To enjoy one's reputation "free from unjustified smears and aspersions" is a right in this free society, but it must be weighed against "significant societal benefit in robust and unrestrained debate on matters of public interest." G.D. v. Kenny, 15 A.3d 300, 310 (N.J. 2011) (quoting Senna v. Florimont, 958 A.2d 427 (N.J. 2008)) (other quotations omitted). The law of defamation attempts to strike "the proper balance between protecting reputation and protecting free speech." Id. (citation omitted).

5

A "statement[1] is defamatory if it is false, communicated to a third person, and tends to lower the subject's reputation in the estimation of the community or to deter third persons from associating with him." W.J.A. v. D.A., 43 A.3d 1148, 1153 (N.J. 2012) (citations omitted). In order to prevail on a defamation claim, a plaintiff must show that (1) the statement was false, (2) the defendant communicated it to another person, and (3) when the defendant communicated that false statement, he acted negligently or with actual malice. G.D., 15 A.2d at 310 (citations omitted).[2]

---

[1] "The short and simple distinction" between the terms libel and slander "is that libel is defamation by written or printed words, or by the embodiment of the communication in some tangible or physical form, while slander consists of the communication of a defamatory statement by spoken words, or by transitory gestures." W.J.A. v. D.A., 43 A.3d 1148, 1153 (N.J. 2012) (citation and quotation omitted). The distinction between libel and slander is not "a quaint vestige of old common-law vocabulary" because the elements of the torts are not identical, and they most diverge in connection with damages. Id. at 1154 (citation omitted). It is not disputed that Crescenz is seeking damages for libel.

[2] The Model Jury Charge for private defamation describes "five elements in addition to damages which plaintiff must prove: (1) a defamatory statement of fact; (2) concerning the plaintiff; (3) which was false; (4) which was communicated to a person or persons other than the plaintiff; and (5) with actual knowledge by the defendant that the statement was false, or with reckless disregard by the defendant of the statement's truth or falsity, or with negligence by the defendant in failing to determine the falsity of the statement." Stonehill v. Nesta, 2007 WL 4258328, *3 (N.J. Super. Ct. App. Div. 2007) (quoting Model Jury Charge (Civil), 3.11B, "Private Defamation" (2002)). Specific or compensatory damages do not need to be proven, however, in private citizen/private concern cases in order to survive summary judgment and receive nominal damages for the vindication of the "dignitary and peace-of-mind interest in one's reputation." W.J.A. v. D.A., 43 A.3d 1148, 1160 (N.J. 2012).

Whether a plaintiff has to prove that the defendant acted negligently or with actual malice depends on whether the plaintiff is a private or public figure, and whether the statement is of public or private concern. The New Jersey Supreme Court recently explained the rules governing when to apply the actual-malice standard for liability purposes in defamation cases:

> The actual-malice standard will apply when the alleged defamatory statement concerns a public figure or a public official or involves a matter of public concern. When published by a media or media-related defendant, a news story concerning public health and safety, a highly regulated industry, or allegations of criminal or consumer fraud or a substantial regulatory violation will, by definition, involve a matter of public interest or concern. In all other media and non-media cases, to determine whether speech involves a matter of public concern or interest that will trigger the actual-malice standard, a court should consider the content, form, and context of the speech. Content requires that we look at the nature and importance of the speech. For instance, does the speech in question promote self-government or advance the public's vital interests, or does it predominantly relate to the economic interests of the speaker? Context requires that we look at the identity of the speaker, his ability to exercise due care, and the identity of the targeted audience.
>
> This much we can say for certain. Discourse on political subjects and critiques of the government will always fall within the category of protected speech that implicates the actual-malice standard. Public policy and common sense also suggest that the same protections be given to speech concerning significant risks to public health and safety. On the other hand, there is no great societal benefit or higher free speech value in providing heightened protection for the defamatory and false statements uttered by one business competitor against another. That form of commercial speech, generally, will call for the application of the negligence standard.

W.J.A., 43 A.3d at 1157 (quoting Senna v. Florimont, 196 N.J. 469, 958 A.2d 427, 443-44 (N.J. 2008)) (internal citations omitted).

In this case, the parties dispute which standard should apply to Crescenz's defamation claim.[3] Defendants argue that Crescenz is a limited-purpose public figure, the statements are a matter of public concern, and, therefore, the "recklessness," or "actual-malice" standard applies. In contrast, Crescenz contends that she is a private figure and the matter is of private concern, and, accordingly, the negligence standard applies.

The Court does not need to decide the issue, however, because even if the statements in the book about Crescenz fall into the private-figure/private-concern category, Crescenz cannot meet her burden to demonstrate that defendants were negligent in making their statements. Accepting as true that Crescenz did not have a sexual relationship with Bender,[4] and in his book Capuzzo falsely

---

[3] Crescenz also advances a claim for false light, which applies a "recklessness" standard. See Durando v. Nutley Sun, 37 A.3d 449, 458 (N.J. 2012) (explaining that to prove the tort of false light, a plaintiff must satisfy two elements: she must show (1) that the false light in which she was placed would be highly offensive to a reasonable person, and (2) that the defendant had knowledge of or acted in reckless disregard as to the falsity of the publicized matter and the false light in which the plaintiff would be placed (citations omitted)). Because the Court finds that plaintiff cannot sustain her burden of proof on the lesser negligence standard, the Court finds that she therefore cannot prove defendants' recklessness to support her false light claim.

[4] Defendants argue that based on the evidence in the record, Crescenz cannot prove the falsity of the statement that she had a sexual relationship with Bender. Crescenz, however, testified in her deposition that she did not have a sexual relationship with Bender. If Crescenz had been able to defeat defendants' motion

stated that she did, Crescenz cannot meet her burden of showing evidence such that a reasonable jury could return a verdict in her favor.

Prior to the August 2010 publication of the book, the following undisputed facts regarding Bender and Crescenz's relationship existed:

1. Bender had an open marriage.
2. Bender was very sexual.
3. Bender walked around his studio naked in front of Crescenz.
4. Bender lived and worked in his studio which contained many nude paintings, phallic symbols, at least one sculpture of the genitalia of one of his girlfriends, and a separate room accessed through an opening in the middle of the studio floor which had a full bar, a nearby bed, and was used for drinking, parties and sexual encounters.
5. In an April 1, 2004 *Esquire* magazine article about Bender, the author described Crescenz as Bender's

---

for summary judgment on the negligence issue, the issue of whether Capuzzo's statement is false would have been one for the jury. See Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986) (in considering a motion for summary judgment, a district court may not make credibility determinations or engage in any weighing of the evidence).

        assistant and "second wife."[5]

6.   Capuzzo was told pre-publication by Bender and others[6] that Bender had a long-term sexual relationship with Crescenz.[7]

---

[5] Crescenz testified that she believed that Bender probably implied to the author that he was having sex with Crescenz (as well as with two other girlfriends), but she did not believe that the text of the article made it appear that she was having sex with Bender.

[6] It is undisputed that the other two members of the Vidocq Society, William Fleisher and Richard Walter, both told Capuzzo that based on their observations of the two and Bender's statements that they believed that Bender and the Plaintiff had a sexual relationship. Fleisher was a retired FBI agent and experienced polygraph examiner and interrogator. Walter was an experienced forensic psychologist and criminal profiler. Capuzzo would have been justified in attributing substantial weight to their opinions. Although plaintiff asserts that Capuzzo knew Crescenz had a different view pre-publication, failed to ask her directly, and viewed Bender himself as a "psychopath," none of these facts undermine the reasonableness of Capuzzo's reliance on the contrary evidence. It is not negligence simply because some evidence contrary to a believed fact exists. Very few things are that black and white. The issue is whether sufficient facts would justify a jury verdict that Capuzzo was negligent. To hold otherwise is to conflate the issue of truth/falsity with negligence. In light of the substantial evidence supporting the challenged statement, a jury would not be justified in viewing the statement as negligently made even if ultimately proved false.

[7] Capuzzo states in his affidavit that Bender, as well as numerous other people, told him that Bender and Crescenz had a sexual relationship. Despite the opportunity in discovery to develop contrary evidence, Crescenz does not dispute these statements are made. Although hearsay if offered to prove the relationship, that is not the relevance of those statements. Rather, they are relevant and admissible to show Capuzzo's state of mind regardless of whether the statements were true (i.e., whether he had a reasonable basis to conclude they had a sexual relationship and was therefore not negligent in saying so). See Fed. R. Evid., Fed. R. Evid. 801(c)(defining hearsay as out of court statements offered for the truth).

7. Capuzzo observed Bender and Crescenz, together and individually, over the course of seven years, during interviews, formal black-tie events, and dinner with Capuzzo and his wife.

8. Crescenz often stayed overnight at Bender's house.

9. Bender and Crescenz traveled together more than 10 times and took vacations together, including to the New Jersey shore, San Francisco, New York, and the Inn of the Dove, and they stayed in the same room.

10. When Bender and Crescenz visited Capuzzo at his home in Wellsboro, Pennsylvania, they stayed overnight at a hotel in the same room with one bed.

11. Handwritten notes, written by Bender and his wife Jan and given to Capuzzo, state that Bender and Crescenz would indulge in all night dancing and drinking.

12. The other two members of the Vidocq Society, William Fleisher and Richard Walter, whom the book is also about, did not make any changes to the galley copy of the book with regard to Bender's sexual relationship with Crescenz.

13. When the Benders' daughter reviewed the galley copy of the book, she did not make any changes with regard to Bender's sexual relationship with Crescenz.

14. When Bender reviewed a galley copy of the book, he did

>>not make any changes with regard to his sexual relationship with Crescenz.

Even though defendants have proffered deposition testimony, certifications, and other evidence to further support their lack of negligence in publishing a book that describes Bender and Crescenz's relationship as a sexual one, these are the undisputed facts as they existed prior to the publication of the book, and they are facts that do not require the assessment of credibility by a jury.  Thus, the question to be answered is whether in light of this evidence it could be said that Capuzzo and Penguin acted "negligently in failing to ascertain the truth or falsity of the statement before communicating it."  Feggans v. Billington, 677 A.2d 771, 775 (N.J. Super. App. Div. 1996).

Crescenz says "yes," and presents other facts she argues should make the question one for a jury.  Prior to the publication of the book:

> 1. Keith Hall, a detective who worked on a cold case Bender help solve, sent an email to Penguin indicating that Capuzzo did not accurately describe how the case was solved.[8]

---

[8] Crescenz characterizes that this error is about "how the case was solved," but the content of Hall's email, Pl. Ex. I, states that Hall objected to Capuzzo's mention of Hall at Richard Walter's house and Hall's comment on a cookie recipe.  Hall states that he was not at that meeting, and requests a pre-publication copy of the entire manuscript.  The Court accepts the characterization of Hall's email to be a demonstration of a pre-publication error.

12

2. During the editing process, someone noted that Capuzzo's reference to Japanese foot-binding was an error--it should have been Chinese foot-binding.

3. Crescenz emailed the publisher, William Shinker, on July 28, 2010, expressing her concern of Capuzzo's "very degrading characterization" of her, and listing the "problems" with the references to her in the book.

4. Penguin did not independently fact-check the book prior to, or after, Crescenz raised her concerns.

5. Capuzzo never asked Crescenz directly if she had a sexual relationship with Bender.

6. Jan Bender never told Capuzzo that Bender had a sexual relationship with Crescenz.

In addition to accepting as true that Crescenz did not have a sexual relationship with Bender and that the depiction of her in the book was false, Crescenz argues that these facts, which also must be accepted as true, demonstrate to a jury that Capuzzo and Penguin did not act reasonably in publishing the book.

In order to determine whether Crescenz has provided enough evidence to support a claim that defendants were negligent in printing a false statement about her, the <u>Restatement</u> is helpful:

> Negligence is conduct that creates an unreasonable risk of harm. The standard of conduct is that of a reasonable person under like circumstances. Insofar as the truth or falsity of the defamatory statement is concerned, the question of negligence has sometimes been expressed in terms of the defendant's state of mind by

13

> asking whether he had reasonable grounds for believing that the communication was true. Putting the question in terms of conduct is to ask whether the defendant acted reasonably in checking on the truth or falsity or defamatory character of the communication before publishing it.

Restatement (Second) of Torts § 580B (1977) (defamation of private person), cited in Feggans, 677 A.2d at 775. With regard to a book publisher and professional writer, they are "held to the skill and experience normally possessed by members of that profession." Id. "Customs and practices within the profession are relevant in applying the negligence standard, which is, to a substantial degree, set by the profession itself, though a custom is not controlling." Id. (explaining that evidence of custom within the profession would normally come from an expert who has been shown to be qualified on the subject, but in the absence of expert testimony, a "court should be cautious in permitting the doctrine of res ipsa loquitur to take the case to the jury and permit the jury, on the basis of its own lay inferences, to decide that the defendant must have been negligent because it published a false and defamatory communication"; "[t]his could produce a form of strict liability de facto and thus circumvent the constitutional requirement of fault").

Crescenz's evidence cannot support her burden. First, with regard to Penguin's lack of a fact-checking process, Crescenz has not produced any evidence, from an expert or otherwise, to demonstrate that a book publisher must independently check every

14

fact in a non-fiction book. To the contrary, defendants have submitted declarations from William Shinker, the president of <u>The Murder Room</u>'s publisher, Gotham Books (which is an imprint of defendant Penguin) who has 40 years of experience in the book selling and trade publishing, and Alexander Gigante, Senior Vice President/Legal Affairs for Penguin, who has 30 years experience in the publishing field, both of whom certify that the custom and practice in the publishing industry is for book publishers to rely on their authors to warrant and stand for the truth of the words they write, which warranty is memorialized in a signed agreement with the authors.[9] Publishers do, however, have most of their non-fiction books vetted prior to publication by outside counsel experienced in publishing matters, and <u>The Murder Room</u> was so vetted prior to publication. There is insufficient evidence that the fact-checking process at issue here was negligent.

Second, Crescenz's email to the publisher days before the book's release does not establish that Penguin acted negligently in releasing it. Crescenz was disgruntled about several passages in the book about her, but she never explicitly stated in her email that she did not have a sexual relationship with Bender.

---

[9] The publisher here states that it reasonably relied upon Capuzzo's education, extensive writing and reporting experience, reputation and accolades, which include nominations for the Pulitzer Prize for two non-fiction books. Crescenz has not provided any evidence to show that Penguin's reliance on Capuzzo's author warranty was negligent. As related herein, pointing out two minor errors in a 440-page book is not sufficient.

15

Even if her email could be read to mean that she refuted having a sexual relationship with Bender, Crescenz's email does not provide any proof, other than her personal concerns, to discredit the other resources upon which Capuzzo based his reporting.  Moreover, Crescenz has not produced evidence to refute defendants' certifications that it is not industry custom or practice to have every subject in a non-fiction book read and approve an advance copy prior to it being published.[10]

    Third, Capuzzo's failure to directly ask Crescenz if she had a sexual relationship with Bender is insufficient either alone or

---

[10] Indeed, although the galley of the book was reviewed by the three main subjects - Bender, William Fleisher, and Richard Walter - as well as Bender's daughter, Crescenz has not produced evidence that all changes requested by these subjects were incorporated into the book.  As defendants point out, many subjects are not totally pleased with how they are portrayed in a non-fiction book.  Even Bender, in his February 24, 2011 affidavit prepared "in contemplation of the probability of my impending death," states that "I have my issues with Michael Capuzzo and some of his generalizations in the book and I feel he sensationalized my story in a somewhat degrading way . . . ." (Def. Ex. L.)  Presumably Bender expressed concern over these issue to Capuzzo prior to the book's publication, but Capuzzo did not make all the changes Bender requested.
    Bender's affidavit details his sexual relationship with Crescenz, and states that after reading her complaint in this case, "I could not believe that Crescenz . . . would blatantly lie about us never having sex together. . . . [T]his claim by Crescenz is bogus."  (Def. Ex. L.)  Although there is reason to conclude that Bender's affidavit might be admissible to rebut plaintiff's claim that the book's recitation of a relationship is false, see Fed. R. Evid. 804(6) (addressing admissibility of trustworthy statements by deceased declarants in civil cases), we need not consider or rely on it here.  Neither the affidavit or Bender's deposition, both taken post-publication, are relevant to Capuzzo's state of mind, and Penquin's knowlege, pre-publication.

in conjunction with other evidence to demonstrate that Capuzzo acted unreasonably in evaluating the truth or falsity of that statement before publishing it. Capuzzo reported in his book about Bender and Crescenz's relationship based upon his observations of Bender and Crescenz over the course of seven years, and from what others had told him. Even if Capuzzo had directly asked Crescenz whether she had a sexual relationship with Bender, and she denied that she did,[11] it would have been reasonable for Capuzzo to conclude that she was not being truthful based on other information he had gathered.

Even less convincing is evidence of an error regarding the

---

[11] Indeed, just as we assume that the alleged defamatory statement was false, we also assume that if asked Crescenz would have denied the relationship. The issue in this case is whether the defendants would have been negligent in publishing the contrary statement even in the face of the denial. We hold that even if Crescenz had been asked and given the presumed answer, the defendants would not have been negligent in the light of the undisputed facts known to them in asserting the opposite. Another way of looking at this issue is to assess the effect a mere denial would have on the free exchange of ideas and opinion. Defamation law must be viewed through this lens. We assume that when accused of a scandalous act a person falsely accused would deny the claim. The issue here is not whether the denial is true (we assume it is); rather, the issue is whether the author acted negligently in asserting the opposite despite the denial. If that were not the rule, a person accused of a scandalous act could insure a jury trial on the issue of the truth or falsity of defamatory statement by merely issuing a simple denial. Many reasonable authors and publishers would shy away for publishing such statements when a denial had been made, was forthcoming, or was even likely. It is of little comfort to one falsely accused, but it is well to remember that the tort of defamation is not designed to provide a remedy for every false statement. For a private citizen, it provides a remedy for only those false statements negligently made.

misstatement of Japanese foot binding instead of Chinese foot binding, and a purported error regarding a detective's different recollection of a meeting.  These mistakes do not cast a net of unreasonableness over the undisputed facts upon which Capuzzo based his depiction of Bender's relationship with Crescenz.

Capuzzo is an experienced, Pulitzer Prize nominated non-fiction writer who spent seven years observing, interviewing, and interacting with Bender, his close associates, his family, and Crescenz.  Penguin is an established publishing company that, when it chose to publish the book, followed industry custom in relying upon the author's warranty of the veracity of the non-fiction work, as well as the vetting of the book by an seasoned attorney.  Accepting as true that Crescenz did not have a sexual relationship with Bender and Capuzzo's depiction of their relationship as sexual was false, based on the undisputed facts as they existed in August 2010 when the book was released, Crescenz has not presented sufficient evidence to show that Penguin or Capuzzo did not act reasonably in checking on the falsity or defamatory character of Crescenz and Bender's relationship before publishing it.

In the milieu of the Vidocq Society this matter might be called the classic "He said, she said."  Ordinarily such cases call upon a jury to decide which version is true.  However, that description in this case would be misleading.  This case need not turn on the resolution of whether Frank Bender or Joan Crescenz

told the truth about their relationship.  Indeed, the issue of the true nature of the relationship between the two is unlikely to ever be resolved.  The two primary participants in these tangled relationships are both deceased, and there is reason to doubt both versions.

Regardless, however, of each party's personal point of view on the nature of Crescenz and Bender's relationship, or even the actual truth, the evidence in the record does not support a finding that either Capuzzo or Penguin were negligent in writing about or publishing one version of that story - a depiction of Bender and Crescenz having a sexual relationship.[12]  Unless plaintiff has sufficient evidence as to both falsity and negligence, her claim of defamation fails.  Plaintiff having failed to proffer sufficient evidence on negligence, an essential element of the tort of defamation, defendants are entitled to judgment as a matter of law.

## **CONCLUSION**

For the reasons expressed above, defendants' motion for summary judgment in their favor on all of plaintiff's claims against them must be granted, and plaintiff's motion for partial

---

[12] Crescenz's remedy, however imperfect, is to marshal her evidence, issue a denial, and let whoever may be interested in the topic reach their own conclusion.  We note also that Crescenz's name has been changed in the paperback and the subsequent printings.

summary judgment on the burden of proof must be denied as moot.

An appropriate Order will be entered.


Date: December 31, 2012          s/ Noel L. Hillman
At Camden, New Jersey           NOEL L. HILLMAN, U.S.D.J.